The case for argument is 15-1447 HBAC Matchmaker Media v. Google. Is it Mr. Liddell?  Liddell. Thank you, Your Honor. Ready? Yes. Good morning, Your Honors, and may it please the Court. Brian Liddell on behalf of the appellant, HBAC Matchmaker Media. If I may, I'd like to reserve four minutes for rebuttal. I want to begin where I think this case sits, which is a single and, we submit, straightforward claim construction issue in which the district court improperly imported extraneous limitations based on particular embodiments within the patent specification to limit a claim term, head-end system, to a particular embodiment or class of embodiments and excluded other embodiments of the specification described. You know, I understand the argument, and both of you seem to be on the same lane in terms of arguing this. It seems to me tentatively, very tentatively, that this is kind of a different case. It's not a claim versus spec case. It seems to me more this claim term that we're talking about appears nowhere in the specification, right? That's correct, Your Honor. And it seems to me what the district court was really doing was not playing with or defining what that claim term was. She was really narrowing the context in which that term was in play with regard to this patent, and that seems to me a little different. Do you have any reaction to that? I think that's a fair observation, Your Honor. From my perspective, I think part of where we perceive the district court going astray is approaching the claim construction exercise as essentially one in which it was to list those embodiments or things that might actually infringe the claim and create a negative limitation as to those things that would not infringe the claim. We submit that that's not the proper exercise for claim construction, that not all constructions necessarily, especially the single term, define fully the scope of infringement or non-infringement in a way that sets out these embodiments or these instrumentalities infringe and these don't, that rather the construction exercise is one of determining the meaning of the term under the various procedures that the court set forth in the Phillips decision. And here we think that this is a term that was, as Your Honor referred to, it was added to the claims, but it was added to clarify and explain a distinction between whether certain decision-making took place sort of at the distribution point or at what the patent refers to as the display site. So as I'm sure the court noted, during prosecution, the examiner raised a particular prior art reference, and the applicants pointed out that in that prior art reference, the decision-making, because this is all about how to decide what advertisements to show and targeting particular advertisements to particular consumers, and the applicants pointed out that in that prior art reference, the decision-making was happening at the display site. The context of the WACOG reference is conventional television, so the suggestion is that it's appropriate to adopt the meaning that was given to the term hidden system in that prior art reference because that was the assumption that was being made when this term was plucked out and added to the patent to distinguish that prior art. Well, I would disagree with the factual premise of your question. First, I don't think that the WACOG reference was strictly limited to cable TV systems. That was a preferred embodiment, and it was described. The applicant, in describing the WACOG reference, even referenced the head-end system of WACOG, for example, in cable television systems. Well, it may not be limited to cable television, but it's limited to conventional television, right, which would include cable. But the point that the applicant made very clearly in the distinction was not that we want this to suddenly be an invention only about cable, or about conventional television. You're absolutely right. They weren't focusing on that aspect of WACOG, but what they were doing is taking a term which was used in WACOG and adding it to the claims here, and the question is what meaning and what understanding should we give to that claim? I mean, if WACOG, for example, had said head-end system means a system for conventional television, you wouldn't dispute, would you, that we'd have to give it that meaning, that that would be the appropriate way to approach it? I think, if I may, I think what you're asking is was this a term of art? What's the answer to my question? If WACOG had said head-end system means a system relating to conventional television. I think if WACOG had provided an express definition of that type, and particularly if this was not a term that was widely used, then that might be the case. That's not the case here. WACOG doesn't say that, and the applicants didn't say that, and, indeed, the evidence in the record is that this was a widely used term with not a specific context of cable television or conventional television, but rather distribution systems much more generally, that this is a term that refers not to what kind of system it's in, but the organization of any kind of system or communications and telecommunications systems more generally, that you have essentially a central distribution hub and multiple receiving points, and that's the topology as contrasted with, for example, a peer-to-peer distribution system where you have multiple distribution points and multiple recipients and direct communication between them. The patent is, indeed, talking about a topology for communications in which you have central distribution with distributed recipients. The central distribution is at the head end. The recipients, the patent refers to as the display sites or the consumer display sites. Can I ask you about the specification? Because one of your major points is that video-on-demand systems wouldn't be, as I understand it, in the court's claim construction, and that's referred to as the third preferred embodiment in the specification. That's correct, Your Honor. And yet when one looks at Figure 7, which is described as a block diagram of a video-on-demand system, it seems to include a conventional television set in the figure as part of a display site.  Your Honor, that is used as an example of a display device in Figure 7. I would refer the court to, in the specification, the discussion of this embodiment, and I think some of this is not necessarily specific only to this embodiment, but the discussion of Figure 7 begins in column 12, this is page A96 of the record, around line 37, and it talks about the video-on-demand system. It makes clear that it's used in cable and other broadband video systems, not just cable. Yeah, but Figure 7 shows what looks like a conventional television set. That's right, Your Honor. That's referred to in the spec as a television receiver. And when we continue the discussion in the specification in column 13 on the following page, and when we get to about line 13 or 14 here, it states that the preferred embodiment of the invention involves supplementary electronics built into set-top boxes, consumer electronics products, personal computers, plug-in modules for the decoder interface of cable-ready products, and other display devices. I think this is very clear disclosure that the TV set is merely an example, not an exclusive or limiting disclosure. It's not, I think, this kind of language. But it shows that a conventional TV is not inconsistent with video-on-demand, which is what you seem to have been arguing. Well, I think that, Your Honor, what I'm suggesting is that the construction is in describing— No, but what's the answer to my question? Isn't it, aren't you conceding that video-on-demand is not inconsistent with acquiring a conventional television set? No, well, conventional television set by itself is not inconsistent with video-on-demand, but that was not the extent and total of the Court's limits. The Court also referred, for example, to multi-channel distribution. That, we submit, is distinct from what the patent describes about video-on-demand systems. At the bottom of column 12, starting at line 65, in discussing this video-on-demand embodiment, the specification states, in this embodiment, the optional video and audio storage device, 551, is not required, nor are a multitude of additional channels for the transport of alternative commercials. So the District Court didn't stop just with a conventional television set. We submit that limiting the claims to a conventional television set is inconsistent with the disclosure. But the District Court also described conventional television systems as involving multiple channels of distribution. The patent says that's not what a video-on-demand system has to be. You could, in theory, have multiple channels in a video-on-demand system, but you don't need them, and that's not what the patent is really talking about. And I think there is where we get to the point of adding these limitations that don't match up with the scope of the disclosure and the way that the applicants were describing their system as delivery system agnostic. They talked about a structure, but they didn't say it had to be cable or it had to be broadcast or it had to be satellite. They referenced each of those things, to be sure, but they weren't limiting references. At the blue brief at pages 17 through 18, you make much of the fact that Judge Robinson's construction excluded the embodiment of radio. But the claims talk about a display device, and a radio is a display device, but that's not a very compelling argument. But the discussion of saying that the term head-end system by itself excludes radio, you're right. Other language in certain claims might exclude radio, but saying the term head-end system by itself excludes radio embodiments is inconsistent with the way that the patent is written. So you could imagine another claim that might be written to a radio embodiment that used the term head-end system. We submit that that would still be something that the patent was discussing. And I don't think that radio – In fairness to the district – if I could interrupt for a moment. In fairness to the district court judge, she dropped a footnote in her markman which says, while the patent also describes radio commercials, neither party seeks to include radio applications in the construction. So isn't, you know, the parties put her in a position of saying, yeah, otherwise I'd put in radio, but you're not talking about it, I'm leaving it on the side, and now you use that kind of against her? Well, to be fair, Your Honor, I don't – I think that the district court – radio was discussed in passing by one counsel during the argument. But the construction put forward by appellant would have included radio in the construction of the term head-end system. We're not purporting to talk about the exact scope of every element of the claim, but head-end system by itself did not exclude radio, and our construction spoke about network communications and would indeed have included radio as one of the kinds of communications. We didn't purport to offer a construction that listed these embodiments infringe and these don't. So what it seems to me that you're saying in response to Judge Stahl's question and Chief Judge Post's question is that perhaps what the district court did here was to construe the wrong term and that perhaps the term – the relevant term here is display site and that that term requires a conventional television set because a display site is always referred to as having a television receiver. Well, I disagree with the further point you made about the display site always being referred to as having a conventional television receiver. For example, as I mentioned, the specification refers to personal computers as one possible item in that context. Are you contending that the claims cover watching a video on a computer? Yes. Because? How? Because the claims use the term display site to refer to the location where you're viewing, and the specification makes clear that that can include lots of different kinds of devices. And the television set is an example in the specification, but television is unquestionably something that people watch on lots of devices. Why does it say that the display site can include something other than a television set? Well, I mentioned, for example, column 13 where the patent describes the various equipment that can be involved and specifically refers to personal computers as one thing. This is, again, page 890. Yeah, but it doesn't refer to personal computers as being the display site, does it? Actually, I disagree, Your Honor. Where does it say that? So in column 13, personal computers is listed at about line 14 in a series of items, and it goes on to refer to and other display devices at the end of that sequence. So I think it is unquestionably referring to personal computers as display devices in that list. That wouldn't be consistent with the last antecedent rule. Well, I think now we're into a debate between some members of the Court and Justice Kagan and perhaps formerly Justice Scalia, but I appreciate your point. I think that it does list, in our view, personal computers as a display device in that context. Okay, you're into your rebuttal time. Why don't we have a seat where we store four minutes, and let's hear from Mr. Pincus. Thank you, Your Honor, and may it please the Court, just to follow up on my colleague's last discussion. I think Judge Dyke's question was about radio, not about personal computers, and the citation, the language— the question of whether the display site here, which seems throughout the patent to be referring to a television set and to exclude radio, but put aside radio, could include watching the video on a computer as opposed to a television set, which seems to be pertinent here because a lot of the Internet viewing occurs on computers and not on television sets. I think, Your Honor, that language that was just discussed talks about the various devices on which the technology for managing the ads might be placed. If the Court turns to the prior page in Column 12, the language in 59 to 63, this whole section is a description of Figure 7, the video-on-demand figure, which, as Your Honor noted, includes only a set-top box and a television, and this language explains that the set-top box is the way the signal is processed. And so that language doesn't include computer. It only talks about set-top boxes, consistent with the figure, which only has a set-top box. The language later in that description talks about the devices on which things may be viewed, which is a different kettle of fish than whether the head-end system requires a set-top box, which we think is the critical question. The other thing I would say about personal computer is the argument here, of course, is about whether Internet-delivered video is covered, and just putting personal computer in a list of things that include something as broad as consumer electronics products really doesn't give any information about the idea that this could extend beyond what the rest of the specification talks about, and as Your Honor talked about, WACOP, which are about cable and other cable-like delivery systems. Well, that sounds to me, as do a lot of the arguments in your brief, more of an enablement or a written description issue than really a claim construction. And Judge Dyke's broader point in his last question was that we've got a term that's being construed that's nowhere in the specification, and we're limiting, we're not redefining, we're not talking about the definition of the term. We're only answering the question of what context are you able to use this and not able to use that. Your brief, your answer to the sort of thing like, are we really talking about the right thing here, claim construction versus validity, seems to only be that our case law has this maximum that you're supposed to construe claims to preserve their validity. No, Your Honor, I think the first part of... Which is also too broader than what I think our case law says, but... I think the first part of our brief was directed to the court's methodology for construing terms, as set forth most recently in the Columbia University case, which is that the court looks broadly at the specification, the prosecution history, as well as the claim language itself, and we think here... But in all of those cases, I mean, was that, I can't, I remember that case, but I don't remember specifically, but I would assume that the term that was being construed from the claims was also, we looked for the use of that term in the spec to tell us what the real true meaning of that term was. I believe, I'll double check, but I believe in Columbia University that there was a similar amendment to add a term. Right. But I think here, even though the term isn't used in the spec because it was added later, the spec itself tells us the kind of system that's being talked about. Maybe you're looking at the wrong word. Instead of head-end system, maybe it ought to be display side. Well, Your Honor, obviously we would be happy with a construction that eliminates internet delivery either way, but I do think head-end system is the right focus because the focus here, when the WACAB amendment was made, was about what kind, was on head-end system. What kind of system is this? Okay, I understand what you're saying, that you looked at that prior art since that's where the word came from, and that prior art talks about cable as a preferred embodiment, although it does have some language at the beginning of it in the first column that's a little broader than that. It says it could be a satellite system or the like, but nonetheless, how do you respond to the evidence of contemporaneous definitions that define the word head-end with respect to a cable system or an internet system? They're like, for example, on page 32 of the blue brief. And then also, the evidence that is in the blue brief at page 33, where it says head-end in a broadband network, the starting point for transmissions to end users, for example, cable networks broadcast stations. So here we are with a specification that doesn't use the word head-end, and there's evidence that the word head-end, as defined at the time of the invention, includes internet applications. How do you deal with that? Well, in several ways, Your Honor. I think, first of all, we have evidence that it wasn't defined that way, including evidence in the Newton's Telecom Dictionary, which my colleague takes issue with us for relying on, because it's broader than just telecommunications. But notwithstanding that fact, it adopts the definition that we advocate. So we think that the dictionary definitions actually support our perspective. So it's like a battle of dictionary definitions? Well, I don't think you have to get to the dictionary definitions. I think they do, because I think there are two other important things. First, I think WACAB, although Your Honor is right, it says cable, television, or the like. It is repeatedly, as we set forth in our brief, making clear that it's cable television systems or cable television-like systems, which is the precise construction that the district court adopted here, that she didn't say cable television only. She said cable television or similar systems that use a set-top box or conventional television and not internet, which, of course, is the critical question for this case. And so we think it's totally consistent with WACAB. Suppose we were to disagree with you and say that the real question here is what's meant by the term display site. Could you address whether display site should be interpreted to require a conventional television set? Well, we think it should be interpreted. Wait, wait, wait. That is a term that is used throughout the specification. We have more guidance as to what that term means than head-end system. We would say it should be interpreted to include either a television set or a device that receives signals from a set-top box, which is the answer to personal computer and the other things there. The district court said set-top box or conventional television, and as I discussed, not just in the discussion of Figure 7, but in the discussion of the first two embodiments, a set-top box is an essential element because that's what translates the signals. And then a variety of different devices might display them. Okay, so let me, along that line, let me understand. That would mean that viewing video on a computer wouldn't be covered by the claims. But if I understand correctly now that you have boxes, and I don't know whether you would call them set-top boxes, that allow you to view video from the Internet on your television set, right? Are you familiar with that? Yes. So wouldn't that suggest that perhaps those implementations would be covered where you're using a box, which might be called a set-top box, to view video from the Internet on your TV? I don't think so, Your Honor, because I think that the context of this patent and the set-top box requirement are tied back to cable and similar technologies. And personal computers at the time could be plugged in to set-top boxes to receive video because the set-top box would have provided the signal. Obviously, things have advanced a lot since then. Why does any of this matter? If you invent a bicycle, a wheel, and the spec is all about using this wheel on bicycles because cars haven't been invented, but somehow 10 years in, somebody invents a car that didn't even exist at the time of the invention and uses this wheel, they're still infringing even though the context of the use of the wheel was exclusively in the spec for bicycles, right? Well, I guess a couple of answers to that, Your Honor. Certainly, the question here is whether Internet delivery is covered. And Internet delivery was certainly known at the time. One of the inventors, as we point out in our brief, was an expert in the Internet, and there's no reference whatsoever to the Internet. So the fact that a smart computer... But TVs aren't mentioned in most of the claims either. I mean, you know, it's... Well, they're mentioned in the specifications and in many other places. Right. So that's the context in which you've invented something, you've claimed something, and in the spec you say this is for use on conventional televisions. So you can't be infringing if you use, and I don't know what the facts are, I don't know what the evidence is for infringement, but that you can't be infringing this claim because you use it exactly as it's described in the claims in another context? Well, I don't think a conventional television works here because a conventional television doesn't have the technology that Judge... Well, isn't that the classic enablement or written description inquiry that ensues, and those issues come up when you construe a claim broadly, like the case, remember, of electrical sensors and mechanical sensors. Construe the claim broadly, libel says, too bad, we gave you what you asked for and you're not enabled or there's not a sufficient written description, right? Isn't that the classic inquiry? We certainly think that is an appropriate inquiry, and perhaps if the court thinks that that's appropriate, maybe the appropriate thing would be to remand the case for the district court to address whether there would be a violation there if the claim had been construed as broadly as a Collins claim it should be. Are you also raising a 101 issue or not? Well, we think there also would be a 101 problem. We didn't talk about it in our brief just because we ran out of space. Well, did you allege it? Did you raise a 101 below? I know you have invalidity contentions. I think we didn't get to that level of specificity. Is there anything in the specification that would suggest that the claimed invention wouldn't work for the Internet? In the specification or the claims? No, I think that's the critical point. Nothing says how it would work, which I recognize might be a 112 argument. My question was, is there anything in there that suggests to you that it would not work? Yeah, well, I think the consistent references to set-top boxes in all three of the embodiments as being a required element and in the figures, in figure 4, 5, and 7. Set-top box is an essential part of this system, and I think that fact combined with the WACOB definition of cable, which obviously has a set-top box, are the two critical pieces that fit together to say this system wouldn't work. It requires a set-top box or a conventional television to work, and the set-top box or technology like a set-top box is set forth just so the court has it convenient at 4, 7 to 8, 5, 2 to 7, and the passages of 12 that we were talking about with respect to figure 7. All three of those embodiments say we need a set-top box, and the fourth embodiment doesn't discuss one way or another. The set-top box might include the boxes that allow you to view Internet video on your television set. I think in the context, I think, first of all, the other part of the specification that we do have talks about the context of this invention being the change from over-the-air broadcast a few channels to the multi-channel cable television environment. That seems a very important reference for giving definition to set-top box, but also WACOP is a very important definition for giving context for giving definition to what set-top box means and why it has to be part of a head-end system just to tie it back to the claim that was being construed because WACOP talks about head-end in the cable context and in the prosecution history. As you acknowledge in your brief, the district court didn't discuss at all anything about prosecution history. I presume the arguments were made. The arguments were made. What is your view of that, that you just thought the specification was so consistent that you made it? I think she thought the specification was enough and that she didn't have to reach them. But they were made, and although my colleague tries in their brief to say that we sort of backed off from them, the full passage at A1457 makes clear that we put those arguments front and center for the very reason that we're talking about here, which is that they provide more support for the context that we rely on. But her whole analysis, at least in version one, was her rationale for reaching the conclusion she reached was that the specification consistently refers to cable TV, television, and VCR. That's a little thin, given our case law. Even if we were applying, she doesn't talk about what the plain meaning is, she doesn't talk about disclaimers, implicit or explicit. There's none of that discussion. A specification consistently referring to certain things doesn't necessarily equate to, therefore, limiting the claim construction to that. Right? I think it doesn't necessarily. There was a lot of other argumentation before the district judge, and she certainly expanded on it when that argument was made in the decision on rehearing. What does the re-hearing give us on that? Does it give us any more specificity on that? I didn't think it did. It maybe gives us a few sites of respect, but I didn't get much more than that out of the re-hearing. Well, it talks about the need for tuners. The material that's at the bottom, I'm looking at A30, the citations that start at the bottom of A30 and go through the rest there, they're talking about channel indicators, tuners and other things and hundreds of more channels, all characteristics of cable or similar systems, which is the argument. And we've certainly, in our brief, tried to show some of that other information that was before her that really does paint a picture of a term that was taken from WATCH-UP, which, again, with all respect to my colleagues, really is limited to cable and similar systems, just as the district court construed here, put in here. They could have said they didn't have to use that term. They could have said not at the display site, which was the reason that the distinction was being made, but they took that term because that term had a meaning. Certainly it had a meaning, and we think the meaning was consistent with what the specification shows was what this patent was getting at. So it was no problem for them to take that term with its meaning because it fit in with exactly what they were doing. Before you sit down, I'm not sure that I understand what the systems are that are being accused of infringement here. Can you tell me some examples? Because I don't think of Google, for example, as selling a system that has the things that are listed in here. It's going to websites like Hulu or YouTube and viewing video. So it's an inducement issue? Well, YouTube is actually a Google-owned company. I see. Okay. So it is any kind of Internet viewing of video, which is obviously something very broad. Internet was known at the time and would greatly expand the scope of this patent. Thank you. Thank you. Thank you, Your Honors. I do want to speak to a couple of points. I think that... Well, do you have any comment about the question that Judge Dyke ended with, the way why this term is being construed as opposed to a display site or something that appears in the claims and the spec? Well, I think from the procedural context, this was a term that the defendants in the case proposed and suggested originally, and to be fair, the district court adopted a construction that was slightly different than the construction that was proposed below. The defendants all proposed the construction or the appeal. No, we understand. I don't want to take your time. I just wondered if you... So this was a construction that they suggested should be provided early because it would be dispositive because their construction was that it was limited only to cable television systems. Where would we be, for example, if we said, okay, the district court focused on the wrong term. The right term to focus on is display site, and display site requires the use of a conventional television set. Where would we be then? Well, I think, first, my suggestion, the district court has not construed display site. There's been no market proceeding of any kind. I understand. And so I think if the court's view is that head-end system, maybe this was not the right construction and there should be construction of display site, the appropriate first step would be a remand for the district court. I understand, but suppose we said, oh, we don't need a remand, it's clear. Display site requires a conventional television set. Where are we in terms of infringement? Well, I think that that arguably might limit some infringement, but I think Your Honor very correctly pointed out probably not all because, as you quite correctly stated, there are devices that allow viewing of Internet video content. I'll give one example that I'm personally familiar with, the Apple TV device. It's a box. It's essentially a smaller but a set-top box type device. It connects to your conventional television set. Whether today's television sets are conventional and what constitutes a conventional television set might be an open question, but it connects to your television set. It allows you to watch video content on that television set, including, for example, videos from the YouTube service or from other sites and services that provide Internet content, including from some of the defendants. That's one example. I think that, and in many instances, of course, the claims aren't just watching video from a source on a site. They involve how you deliver and decide what advertisements to send to a consumer, and that's really obviously the focus of the invention and of the claims is about the targeting of advertisements. The references to the head end and the display site we submit are really more about the orientation of where things are happening in the overall system, not about limiting it to a particular specific context or a particular technology device. In that respect, I think the specification is repeatedly clear that it's talking about a number of systems. I just wanted to reference, for example, I think counsel referenced some portions as well, but in column 4 of the patent, for example, it talks about delivery and material coming over cable, DBS, which was a direct broadcast satellite type of technology, telephone, et cetera. Where are you in column 4? I'm sorry, this is at column 4 around line 8 to 9. And these... This is a patent from 1995. DBS was far from a conventional television service at that time. This was a brand new satellite delivery technology. Telephone was virtually nonexistent as a means for delivery of television and video programming in 1995. These are talking about new technologies. There's lots of references in the specification to broadband delivery. These are various and multifaceted communication systems not limited to one particular kind of delivery. Thank you. Thank you, Your Honor.